WILLIAM BLIEVERNICHT and Alvena Blievernicht, Appellants,
v. N. E. LANDEENE, as Administrator of the Estate of August
Peterson, Deceased, Ottelia Peterson, Lillian C. Landeene, Farm
Mortgage Loan & Trust Company, Commercial State Bank of
Carrington, North Dakota, A. Bourk, Ed. Bourk, and August Zink,
Defendants. R. M. DEPUY, L. A. Mielke, and the James River
National Bank, a Corporation, Respondents.

(208 N. W. 765.)

**Mortgages — evidence held to show that plaintiffs are owners of mortgage
sought to be foreclosed.**

In an action to foreclose a real estate mortgage, certain parties, who claimed
ownership of the mortgage adverse to the plaintiffs, were named parties de-
fendant. The only controversy at the trial and upon appeal to the supreme
court is as to the ownership of the mortgage. The evidence is examined, and
it is *held*, for reasons stated in the opinion, that the plaintiffs are the owners.

Opinion filed April 22, 1926.

Mortgages, 27 Cyc. p. 1621 n. 68 New.

Appeal from the District Court of Stutsman County, *Coffey,* J.
Reversed and remanded.
*Carr & Rittgers,* for appellants.
*C. S. Buck,* for respondents.

BIRDZELL, J. This is an action brought to foreclose a real estate
mortgage. There are various parties defendant other than the mortgag-
or, among whom are R. M. DePuy and L. A. Mielke. There was a con-
troversy in the lower court involving the ownership of the mortgage
under foreclosure, it being claimed both by the plaintiffs and by the
two defendants, DePuy and Mielke. A judgment in foreclosure was
entered in favor of these two defendants as the owners of the notes and
mortgage. From this judgment the plaintiffs have appealed and a trial
de novo is demanded. The controversy in this court is wholly as to the
propriety of that part of the judgment decreeing the ownership of the
mortgage to be in DePuy and Mielke rather than the plaintiffs. The
facts essential to an understanding of the questions presented may be

stated as follows: In September, 1919, one August Peterson, since deceased, and Ottelia Peterson gave to the Farm Mortgage Loan & Trust Company of Carrington, North Dakota, a note and mortgage for $3,000, due December 1, 1924. These were subsequently sold and assigned to the plaintiffs, residents of Columbus, Wisconsin. Defaults having occurred in the payment of interest and taxes, the plaintiff, Mrs. Blievernicht, in the summer of 1924, came to North Dakota to examine the land covered by the mortgage and obtain such information as she could with respect to the investment. While here she met the defendant Mielke with whom she had long been acquainted, knowing not only him but his father and his sisters, she and the sisters being "good friends." Upon her return to her home in Wisconsin, she talked over the situation with her husband and a correspondence ensued with reference to a proposed sale of the note and mortgage in suit. The correspondence, at first between Mielke and Mrs. Blievernicht, was later taken up by the defendant DePuy and the Blievernichts. It is too voluminous to be set forth at length in this opinion, but, inasmuch as the contentions of the parties with reference to the sale of the mortgage are practically all based on the correspondence, it will be necessary to state the substance of it. On November 22, 1924, Mielke wrote the plaintiffs, asking for the lowest cash figure at which they would sell the mortgage, calling attention to the fact that there were about $700 past due taxes on the land and that the current taxes would amount to about $125 more. He suggested that in case he obtained an assignment of the mortgage he would foreclose at once, and if the plaintiffs did not ask too much he might buy it. To this letter the Blievernichts replied, quoting a price of $1,500 cash, or one half of the principal. To this letter Mielke replied on December 1st, declining to pay this amount, saying "but I will give you $1,000 cash and take chances on getting out. You see $1,000 cash together with the tax and foreclosure will make a sum of about $1,875 or $1,900." He said this was his best offer and if they would take $1,000 in cash it would be a go, and, if not, that he would do what he could to see that the plaintiffs got all that it was possible to get. To this letter the plaintiffs promptly replied that they had decided the best thing for them to do was to take the $1,000 cash, saying that as soon as they received the money they would send the papers—abstract, mortgage and notes. After some further correspondence explanatory of the

liens against the land, in which Mielke still declared a willingness to pay $1,000 for the mortgage if the plaintiffs were entirely satisfied and in which the plaintiffs expressed disappointment at their loss but a willingness to go on with the deal, Mielke wrote that he would have to wait until after the first of January to borrow some money at the bank. Then on January 8th, he advised the plaintiffs that he had gotten a man in Jamestown to take a half interest with him and that they together had placed $1,000 in the James River National Bank for the plaintiffs. He requested that the papers be sent to this bank for collection and delivery upon payment of the money. The plaintiffs forwarded the assignment and other papers to the James River National Bank and requested that the money ($1,000) be sent to the First National Bank of Columbus, Wisconsin. Replying to this letter on January 16, 1925, the president of the James River National Bank, Graves, wrote, advising the plaintiffs of errors in the assignment and requesting the execution of new papers. To this letter the plaintiffs replied on January 19th, apparently sending the new assignment. On January 26th the defendant DePuy takes up the correspondence, expressing regret at the delay in remitting for the assignment, and attributing it to a delay in the abstractor's office. He stated that, upon receipt of the abstracts and a statement from the attorney that the mortgage and title were in proper shape, remittance would be sent "as we have the funds here subject to approval of the attorney." He signed, describing himself as "Auditor." Three days later he wrote, calling attention to some alleged defects in the title, stating that it would take a little time to straighten it out and saying "at the present time your mortgage is worthless unless this can be arranged." He also suggested that there mght be some slight expense in connection with the clearing of the title and solicited authority to pay the expense out of the $1,000 "if your deal goes through." DePuy, having entitled this letter "In re Mielke-DePuy," the plaintiffs on receipt of it wrote as follows on January 31st:

"Mielke & DePuy.

"Dear Sir:

"Your letter was received today. We surely regret to know the contents of your letter. We surely want you to go on with this as we cannot afford to lose that money. Hoping you will be reasonable with us.

"Yours very truly.

"Mr. and Mrs. William Blievernicht."

On February 9th, DePuy wrote again concerning these alleged defects, stating that it would require two lawsuits to straighten out the title. This letter contained an offer as follows: "Our offer to you for our client is a follows: He will pay you $500 at the present time and hold up the other $500 payment, making a total of $1,000 asked by you with the provision that the latter $500 be held in trust to pay the costs of the two lawsuits—that the residue be remitted to you at the completion of the suits and clear title obtained; or we are advised to suggest to you that our client will pay you $500 outright and stand the expense of the lawsuits himself if you prefer this manner of settlement." The letter contained this further suggestion: "that at the present time your mortgage is not worth the paper it is written on and it is necessary to have the above mentioned suits brought." On February 19th DePuy wrote, repeating the proposition and stating that he had not heard from the plaintiffs, adding that a bank in Carrington held a prior lien to the mortgage in question amounting to $350. On the 28th Mielke again wrote to the plaintiffs, stating that he had been to Jamestown to see DePuy. He reiterated the objections to the title and purported defects that had been previously contained in DePuy's letters and restated DePuy's proposition.

About this time the situation was under investigation by attorneys employed by the Blievernichts and very soon after this fact was ascertained by DePuy he or the bank forwarded to the plaintiffs a letter dated January 21, 1925, and a draft for $1,000. DePuy testified that this letter was written on January 21st and that the draft was then purchased by himself and Mielke but that the bank had held them up at his request during the negotiations above abstracted; that he was actively in charge of the matter; that he had had the draft drawn and delivered to himself; that in doing so he was acting for the bank and the bank was

acting for the plaintiffs. Promptly upon receipt of the draft on March 6th, the plaintiffs wired and their Wisconsin attorneys wrote the bank refusing to accept it and repudiating all negotiations.

It is the contention of the respondents that, promptly upon the receipt of the papers by the bank in January, they, as individuals, accepted the plaintiffs' proposition and purchased the draft; that it was at all times thereafter in the hands of the bank and subject to being claimed by the plaintiffs; that the offer was by these acts completely accepted so far as they were personally concerned and that they were henceforth the owners of the mortgage regardless of the subsequent attitude of the bank in holding up the transmission of the draft pending further negotiations looking toward the obtaining of the mortgage for a lesser price. The defendants take the position that, individually, they had delivered the draft but, as DePuy says, "as a bank we hadn't. It was in the bank's control. What I can do personally is aside from what the bank can do." "Question: You had full control of the matter on behalf the bank? Answer: Yes, sir. Question: And it was at the request of yourself, as you have previously testified, that the remittance was not made on January 21st? Answer: Yes, sir. . . . Question: At whose request was it held up until March 5th? Answer: It was my own. I will admit it was a strange situation."

It would be strange indeed if equity were compelled to stand mute and helpless before the situation that is presented by these facts. It will be noted that both DePuy and Mielke—DePuy certainly and Mielke probably—knew of the draft and the letter dated January 21st, if extant, and thereafter both of them, for a period of approximately six weeks, concealed those important facts from the plaintiffs and represented to them, substantially, that the mortgage was worthless owing to some defects in the title that seem to have been fanciful rather than real. Furthermore, DePuy, who was handling the matter for the bank and consequently could have directed the bank at any time to send the draft, was at all times responsible for the delay which he was utilizing for the purpose of obtaining more favorable terms for himself. In other words, both DuPuy and Mielke were, during this period, representing to the plaintiffs that they had not paid the $1,000 and were seeking better terms. They now claim that the $1,000 was paid the 21st of January. Having for six weeks or more, by concealment and misrepresentations

with reference to their own acceptance of the plaintiffs' offer, induced the plaintiffs to believe that the offer had not been accepted, and having, by the same means, kept from them the advice that they had a perfect remedy against the bank for their $1,000, they now contend that they may freely assert the contrary. This contention leads to a most extraordinary logical conclusion. DePuy's present assertion that the purchase was completed in January convicts him of an attempt to defraud the plaintiffs out of $500. Having been unsuccessful in this attempt, he now desires to use the fact that he had concealed, when concealment was essential to the accomplishment of his fraudulent purpose, as the basis of his present right. He could not in the beginning both conceal his acceptance and rely upon it; neither can he do so now. Having conducted further negotiations on the strength of representations of non-acceptance, the defendants cannot complain when the plaintiffs act on those representations and assert ownership of the mortgage.

On the record before us we are not required to hold, however, that DePuy and Mielke are estopped by their subsequent conduct to assert a legal title to the mortgage in question based upon a supposed acceptance of the plaintiffs' offer on January 21st. We are of the opinion that, under the evidence, the title and right of the defendants DePuy and Mielke are defeated upon a reasonable view of the facts. First, we are of the opinion that a finding that DePuy and Mielke purchased the draft for $1,000 on January 21st and turned the same over to the bank to be delivered to the plaintiffs as an acceptance of their offer to sell the mortgage for this amount could not be properly sustained under the evidence. Practically the only evidence to support such a finding is DePuy's testimony. In view of the fact that the same testimony convicts him of an attempt to defraud the plaintiffs, we do not think it entitled to much weight. This particular transaction is capable of being established by the production of supporting evidence of a credible variety, the records of the bank, and yet such evidence is not in the record. So long as the transaction was being handled in the bank by De Puy, who was personally interested, it is not altogether improbable, in view of the other evidence, that he would date the draft and letter back when he found he could not get more favorable terms. Second, we are clearly of the opinion that, on the record here presented, the bank was simply

DePuy's alter ego. It will readily be observed that the contentions of the respondents depend for their validity upon maintaining throughout distinct individualities for the counterparts of Doctor Jekyll and Mr. Hyde, DePuy and the bank. If, therefore, those personalities become convertible, this ·quality will prove as fatal to the respondents' cause as the perversity of the magic potion proved to the original Mr. Hyde.· It will be remembered that it was at the suggestion of Mielke that the papers were sent to the bank in the first instance and that they were not sent until arrangements had been made for DePuy to have an interest in the deal. DePuy's own testimony shows that he, at all times, had full control of the transactions of the bank in connection with the matter. It is of no consequence that the plaintiff, in these circumstances, might have recovered against the bank. (But, in such a suit, what would have prevented the bank from successfully contending that the delivery of the draft was contingent upon the completion of the title, as indicated by the correspondence?) They had the right that they are now exercising, of disregarding the bank or treating it for what it in reality was, DePuy. Since the action of the bank was controlled by DePuy, he cannot say that the delivery of the draft to it for transmission to the plaintiffs was a complete acceptance. It could as well be urged that a check drawn in secret and placed in his own safety deposit box, without the fact being communicated ·to the other party, amounted to an acceptance.

It appears that the defendants Mielke and DePuy, or Mielke, have paid certain general taxes and some hail indemnity. It does not appear that these were paid in carrying out any design previously formulated to defraud the plaintiffs. The tax lien, having been paramount to the mortgage, should still be regarded as paramount as between these parties, but the plaintiffs should be given a reasonable time in which to satisfy the claims of the defendants in this respect by the payment of the amount with six per cent interest. However, the hail indemnity paid was levied subsequent to the date of the mortgage. As to this the mortgage is prior and must remain so. While there is no equity in favor of those who are shown to have paid such hail indemnity sufficient to entitle them to redeem from the mortgage foreclosure sale, the appellants have signified a willingness to accept the amount necessary for redemption in full satisfaction of their claims to the land and the

mortgage. In view of this fact, the judgment may provide for redemption within thirty days, and, in case no redemption is made, the plaintiffs to have thirty days, in which to discharge the tax lien now held by the defendants.

The judgment is reversed and the cause remanded for further proceedings not inconsistent with this opinion.

CHRISTIANSON, Ch. J., and NUESSLE, BURKE, and JOHNSON, JJ., concur.